UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

YVETTE J. SOLSBEE,

               Plaintiff,                                 09-CV-0348

        v.

                                                   DECISION
                                                  and ORDER

MICHAEL J. ASTRUE,
Commissioner of Social Security,

               Defendant.
_____


**INTRODUCTION**

Plaintiff Yvette J. Solsbee ("Plaintiff") brings this action pursuant to 42 U.S.C. §405(g), seeking review of a final decision of the Commissioner of Social Security ("Commissioner"), denying her application for Disability Insurance Benefits ("DIB"). Specifically, Plaintiff alleges that the decision of the Administrative Law Judge ("ALJ") Robert T. Harvey, which denied her application for benefits, was not supported by substantial evidence and contrary to applicable legal standards.

The Commissioner moves for judgment on the pleadings pursuant to the Federal Rules of Civil Procedure 12(c) ("Rule 12(c)") on the grounds that the ALJ's decision is supported by substantial evidence in the record and therefore should be affirmed. Plaintiff opposes the Commissioner's motion and cross-moves for judgment on the

1

pleadings, on the grounds that the ALJ's decision contained legal errors and was not supported by substantial evidence in the record.

## BACKGROUND

Plaintiff, who was 42 years old at the time and a former retail sale representative for Kraft Foods Global, Inc., filed an application for DIB on October 18, 2004. (Tr.[1] at 85, 88). Plaintiff alleged that she became unable to work on December 31, 2002, due to rheumatoid arthritis, Crohn's disease, cervical facet syndrome with right brachial plexus irritation, right suprascapular syndrome and myofacial pain syndrome. (Tr. at 87, 96). The application was initially denied on April 27, 2005 and Plaintiff filed a timely request for an administrative hearing. (Tr. at 57, 61).

Plaintiff appeared, with counsel, and testified at the hearing on August 9, 2007 in Jamestown, New York, before ALJ, Robert T. Harvey. (Tr. at 575-612). In a decision dated September 7, 2007, the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act ("the Act"). (Tr. at 26-32). The ALJ's decision became the final decision of the Commissioner on March 17, 2009, when the Appeals Council denied further review. (Tr. at 6-10). On April 13, 2009, Plaintiff timely filed this action.

---

[1] Citations to "Tr." refer to the Transcript of the Administrative Proceedings.

## DISCUSSION

### I.  Jurisdiction and Scope of Review

42 U.S.C. § 405(g) grants jurisdiction to district courts to hear claims based on the denial of DIB.  Additionally, the section directs that when considering such claims, the court must accept the findings of fact made by the Commissioner, provided that such findings are supported by substantial evidence in the record.  Id. Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938).  Section 405(g) thus limits the court's scope of review to determining whether or not the Commissioner's findings are supported by substantial evidence.  See Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983) (finding that the reviewing court does not try a benefits case de novo).  The court is also authorized to review the legal standards employed by the Commissioner in evaluating the plaintiff's claim.

The court must "scrutinize the record in its entirety to determine the reasonableness of the decision reached."  Lynn v. Schweiker, 565 F.Supp. 265, 267 (S.D.Tex. 1983) (citation omitted). Consequently, the Commissioner moves for an order to affirm the decision pursuant to sentence four of 42 U.S.C. 405(g), which provides "[t]he court shall have the power to enter upon the pleadings and transcript of the record, a judgment affirming,

3

modifying or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for rehearing." A remand to the Commissioner for further development of the evidence under 42 U.S.C. 405(g) is appropriate when "there are gaps in the administrative record or the ALJ has applied an improper legal standard." Rosa v. Callahan, 168 F.3d 72, 82-83 (2d Cir. 1999). However, "where the existing Record contains persuasive proof of disability and a remand for further evidentiary proceedings would serve no further purpose, a remand for calculation of benefits is appropriate." White v. Comm. of Soc. Sec., 302 F.Supp.2d 170, 174 (W.D.N.Y. 2004). The goal of this policy is "to shorten the often painfully slow process by which disability determinations are made." Id. I find that (1) the ALJ's decision was not supported by substantial evidence, and (2) the record contains substantial evidence of disability such that further evidentiary proceedings would serve no purpose. Accordingly, I grant Plaintiff's motion for judgment on the pleadings.

## II. **The Commissioner's decision to deny the Plaintiff benefits was not supported by substantial evidence in the record**

In his decision, the ALJ applied the Social Security Administration's five-step sequential analysis.[2] See 20 C.F.R.

---

[2] The five-step analysis includes: (1) ALJ considers whether claimant is currently engaged in substantial gainful activity; (2) if not, ALJ considers whether claimant has a severe impairment which significantly limits his physical or mental ability to do basic work activities; (3) if claimant suffers such impairment, third inquiry is whether, based solely on medical evidence, claimant has impairment which is listed in regulations Appendix 1, and if so claimant will be considered disabled without considering vocational factors; (4) if claimant does not have listed impairment, fourth inquiry is whether, despite claimant's severe impairment, he has residual functional

4

§ 404.1520. At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since the alleged onset of her disability on December 30, 2002. (Tr. 28). The ALJ then determined at step two that Plaintiff's fibromyalgia was a severe impairment. However, the ALJ determined that Plaintiff's Chron's disease, sleep apnea, and adjustment disorder with depression were not severe impairments. (Tr. 28-29). Furthermore, the ALJ concluded that these impairments did not meet or equal, either singly or in combination, any of the impairments listed in Appendix 1, Subpart P of Regulations No. 4. Id.

At step four, the ALJ found that Plaintiff retained a residual functional capacity ("RFC") which allowed her to perform sedentary work with additional occasional limitations. (Tr. 29-31). The ALJ opined that Plaintiff was precluded from performing her past relevant work as a sales representative. (Tr. 31). However, based on SSR 85-15 and 96-9p, the ALJ also concluded that Plaintiff's additional limitations had "little or no effect on the occupational base of unskilled sedentary work." (Tr. 32). At step five, the ALJ improperly relied on the Medical-Vocational Guidelines ("the Grids") to determine whether Plaintiff could perform other work. Given Plaintiff's age, education, previous work experience and her RFC, the ALJ concluded that she was not disabled. I find that the ALJ failed to properly analyze the medical evidence in the record,

_____

capacity to perform his past work; and (5) if claimant is unable to perform past work, ALJ determines whether claimant could perform other work. See id.

incorrectly assessed Plaintiff's credibility, misapplied legal standards, and erred in not contacting a vocational expert. There is substantial evidence in the record to support a finding of disability.

## III. The ALJ mischaracterized Plaintiff's testimony

The ALJ determined that claimant's statements concerning the intensity, persistence and limiting effects of her symptoms were generally credible,[3] "but not to the extent alleged." (Tr. 30). The ALJ found Plaintiff's symptoms inconsistent with her activities of daily living. (Tr. 31). The ALJ noted that Plaintiff's daily activities included cleaning, cooking, loading the dishwasher, doing laundry, sweeping, mopping, shopping, and driving a car. (Tr. 30).

This finding is inconsistent with Plaintiff's testimony at the administrative hearing. Plaintiff testified that she could not make beds, vacuum, take out the trash, do yard work, or perform hobbies. (Tr. 598-99). She testified, "I used to be very meticulous on my house and it's basically 'gone to the dogs'," and that she did "maybe a load every four days" of laundry. (Tr. 598). She stated that "I Swiffer spots up off the kitchen floor, but that's about

---

[3]  In analyzing Plaintiff's RFC, the ALJ must first determine, based upon the objective medical evidence, whether the medical impairments "could reasonably be expected to produce" the alleged pain or symptoms. See 20 C.F.R. §§ 404.1529(a), 416.929(a).  Second, the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to do basic work activities. See 20 C.F.R. § 404.1529(c); SSR 96-7p.

it" and that she had "friends and family that help" with other chores. (Tr. 599). The ALJ, however, concluded that Plaintiff was able to mop and sweep. (Tr. 30).

Plaintiff claimed that she could "sometimes" bathe and dress herself without a problem, and that she had difficulty getting out of the bathtub. (Tr. 606). The ALJ, again, mischaracterizes this testimony to Plaintiff's disadvantage by simply stating that she "is able to bath/dress herself" without indicating any limitations. Plaintiff testified that "some days I can't even get out of my bed myself. The phone's right beside me. I have to call my mother or a family member or friend." (Tr. 607).

Plaintiff also testified that shopping was difficult for her and that she needed a friend or family member to carry and unload groceries. Additionally, Plaintiff stated that she used to have two people living with her, but now had to perform her daily activities on her own. (Tr. 607-8). "The mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise does not in any way detract from [a claimant's] credibility as to [his or her] overall disability." F. Vertigan v. Halter, 260 F.3d 1044, 1050 (9th Cir. 2001).

Plaintiff complained of constant knee, back, and neck pain. (Tr. 588). She testified that her arms had the tendency to go numb and that problems with her hands would cause her to drop things.

(Tr. 588). During the course of the hearing the ALJ asked Plaintiff why her hand was shaking and she responded that she was in a lot of pain. (Tr. 579). She also testified that she had tremors, which objective medical evidence supports. (Tr. 605, 167-69). Overall, Plaintiff rated her pain (on a scale where 10 was the most severe), as being 6 on average, and 9 and a half on bad days. (Tr. 603).

Plaintiff's testimony regarding the extent of her limitations was not included in her RFC assessment. The ALJ determined that Plaintiff had the RFC to lift and carry 10 pounds, sit 6 hours in an 8 hour day, and stand and walk 2 hours in an 8 hour day. (Tr. 29). However, Plaintiff stated that she could not stand for more than 20 minutes or sit for more than 40 minutes. (Tr. 601). She testified that she could walk about half a city block before her knees gave out. (Tr. 600). Plaintiff said that she could not reach her arms over her head, hold her arms straight out at shoulder level, or push or pull without pain. (Tr. 601). She testified that a gallon of milk was the amount that she could lift. (Tr.600). The ALJ determined that Plaintiff had "occasional limitations in bending, climbing, stooping, squatting, kneeling, balancing, crawling, and pushing/pulling with the upper extremities." (Tr. 28). However, Plaintiff testified that she could not do any of these things without a problem. (Tr. 600-1). Additionally, she stated that she had difficultly manipulating buttons, zippers, and jars, and would occasionally have a problem picking up small objects off the table.

(Tr. 602). Consultative Examiner, Dr. Jonathan Wahl opined that Plaintiff had moderate to marked restrictions in activities that would involve forward elevation, abduction/adduction of her right shoulder, reaching, prolonged standing, lifting, carrying, and bending at the waist. (Tr. 264). Despite Plaintiff's testimony and medical evidence, the ALJ classified these limitations as "occasional" and did not mention her problems with manual dexterity. An ALJ cannot "ignore an entire line of evidence that is contrary to [his] findings." Zurawski v. Halter, 245 F.3d 881, 888 (7th Cir.2001) (quoting Henderson v. Apfel, 179 F.3d 507, 514 (7th Cir.1999)).

In determining a claimant's credibility, the ALJ must also consider the treatment received, and the type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). Here, Plaintiff took the following prescription medications: Darvocet, Vicodin, prednisone, Paxil, Sulfasalazine, Imuran, Bextra, Zyrtec, Cyclobensaprine, and Cymbalta. (Tr. 261, 592). She testified that the medications made her feel lethargic and swell up. (Tr. 592-3). "A longitudinal medical record demonstrating an individual's attempt to seek medical treatment for pain...lends support to an individual's allegations of intense and persistent pain." SSR 96-7p. The record indicates that Plaintiff repeatedly sought treatment for her pain. In 2003, Plaintiff was receiving physical therapy

treatment, massage therapy twice per month, and chiropractic treatment once per month, as well as utilizing a TENS unit everyday. (Tr. 178). Treating physician's notes confirm her testimony that her treating doctors "basically have told me that there's not much more they can do other than offer me medications." (Tr. 603). Dr. Montanaro reported in a October 14, 2002 treatment note that "she may need to have an assessment by rheumatology for possibility of fibromyalgia, but again I believe at this stage we have nothing to offer her." (Tr. 168).

The ALJ determined that the fact that Plaintiff was looking for employment undermined her credibility. Plaintiff testified that she used the services of Chautauqua Works, a placement organization, to help her find a job that could accommodate her medical condition. (Tr. 594, 606). Plaintiff testified that she ". . . applied for numerous positions . . . had a couple interviews . . . she was asked questions during the interviews . . . ." If she sat for "a long period of time, . . . she got stiff . . . and when I get up, they obviously find out that I have some problems but I have been trying. I've been looking for the ideal job." (Tr. 594). The ALJ concluded that Plaintiff "tried to minimize her testimony that she is actively looking for employment." (Tr. 31).

However, the Plaintiff's failure to find work actually lends support to her allegation that she cannot engage in substantial gainful activity. "[W]here an applicant has unsuccessfully attempted

to secure employment, less evidence is needed to support a finding of disability than where the applicant has failed to make such an effort." Walston v. Gardner, 381 F.2d 580 (6th Cir. 1967). Moreover, even if Plaintiff was able to obtain employment, which she was not, "employment is not proof positive of ability to work since disabled people, if desperate (or employed by an altruist), can often hold a job." Wilder v. Apfel, 153 F.3d 799, 801 (7th Cir. 1998).

"Careful consideration must be given to any available information about symptoms because subjective descriptions may indicate more severe limitations or restrictions than can be shown by objective medical evidence alone." SSR 96-8p. This is particularly true in cases where a claimant suffers from fibromyalgia,[4] because this chronic condition has been recognized as a disorder that is not easily detected with standard clinical tests. See Lisa v. Secretary of Health & Human Servs., 940 F.2d 40, 44-45 (2d Cir. 1991). This court has held that "where fibromyalgia is the alleged disability, a claimant's testimony, regarding her symptoms from the disorder, should be given increased importance in the ALJ's determination of whether the claimant is disabled." Davidow v. Astrue, 2009 WL 2876202 (W.D.N.Y. 2009); see also, Soto v. Barnhart, 242 F.Supp.2d 251, 256 (W.D.N.Y. 2003).

---

[4]   Fibromyalgia is a chronic condition causing widespread soft-tissue pain, involving particularly the neck, shoulders, back, and hips. This disorder is also accompanied by weakness, fatigue, depression, and sleep disturbance and is often diagnosed when there is point tenderness found in 11 of 18 specific sites. See Stedman's Medical Dictionary, 725 (28th ed. 2006).

Here, the ALJ did not accurately depict Plaintiff's testimony regarding the severity of her symptoms. A plaintiff "need not be an invalid to be found disabled" under the Social Security Act. Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir. 1998) (quoting Williams v. Bowen, 859 F.2d 255, 260 (2d Cir. 1988)). The ALJ was not entitled to dismiss Plaintiff's subjective testimony solely because she engaged in a limited range of daily activities. By ignoring many of Plaintiff's subjective complaints and misstating her testimony, the ALJ wrongly concluded that Plaintiff maintained the RFC for sedentary, unskilled work.

**IV. There is substantial medical evidence in the record to support Plaintiff's claim for disability**

**Musculoskeletal Impairments**

Plaintiff alleged disability on the basis of her back, neck, and shoulder impairments. The ALJ determined that Plaintiff's fibromyalgia was a severe impairment, however, he did not specifically address whether Plaintiff's musculokskeletal impairments were "severe" within the meaning of the Regulations. Under listing 1.00, for a musculoskeletal impairment to be severe, Plaintiff must have the "inability to ambulate effectively on a sustained basis for any reason, including pain associated with the underlying musculoskeletal impairment or the inability to perform fine and gross movements effectively on a sustained basis." 20 C.F.R. Pt. 404, Subpt. P, App. 1. One example of ineffective ambulation is the inability to walk a city block at a reasonable

12

pace. Id. Plaintiff testified that she could only walk half a
block without a problem. (Tr. 566). As stated above, Plaintiff
also testified that she was not able to perform fine and gross
movements, such as reaching, pulling, grasping, and fingering on a
sustained basis and that she is in constant pain. (Tr. 588).

As required by the listing, Plaintiff's musculoskeletal
impairments are supported by medically acceptable imaging and
diagnostics. Plaintiff was treated by Dr. Stephen A. Rynick and
Dr. Brooke Kelly from April 13, 2001 through July 30, 2003, for
pain in her upper back and shoulders with numbness and tingling in
the right arm and hand. (Tr. 202-34). A July 3, 2001 cervical spine
magnetic resonance imaging ("MRI") showed a bulging disc at C5-C6,
and cervical spondylosis with narrowing of the neural foramina at
the C5-C6 level. (Tr. 233). X-rays from March 2, 2001, and
April 13, 2001 showed moderate multilevel degenerative disc disease
of the lower thoracic spine, mild levoscoliotic curvature, disc
degeneration at C5-C6, and hypolardic cervical spine. (Tr. 234,
385). Plaintiff was treated with trigger point injections.
(Tr. 204-10, 212-16, 222, 225-26, 229-30).

Dr. Kelly diagnosed subacute supraspinatus tendonitis,
cervical disc disease at C5-C6, cervical and thoracic strain/sprain
syndrome, radiculitis, and chronic trapezius muscle spasm. (Tr.
218-20). In a September 3, 2002 treatment note, Dr. Kelly reported
that Plaintiff had brachial neuritis and cervical facet syndrome

with underlying cervical disc bulge with acute myofascial pain syndrome. (Tr. 216). Dr. Kelly opined that Plaintiff had a mild to moderate disability which began on July 8, 2003, and that her condition would be permanent because she had reached maximal medical improvement. (Tr. 202).

On October 14, 2002, Plaintiff saw Dr. Anthony J. Montanaro for complaints of tremors, weakness in the upper extremity, and back pain. Dr. Montanaro noted "obvious tremors" in both extremities and diminished grip strength. (Tr. 168). He diagnosed tremors and intermittent right arm radiculopathy and weakness. Id. Plaintiff's back pain and bilateral shoulder pain is also supported by the finding of consultative examiner Dr. Wahl. (Tr. 263).

Plaintiff also saw Dr. Ajai K. Nemani, a pain specialist, for her chronic musculoskeletal pain and fibromyalgia from February 14, 2005, through May 24, 2006. In February of 2005, Dr. Nemani's exam revealed a slight hump in the lower thoracic region and shoulders (Tr. 368-369). An MRI showed disc protrusions at the C5-C6 level with some indentation on the dura. (Tr. 368). Plaintiff had a limited range of motion in the right shoulder. (Tr. 369). Dr. Nemani noted that Plaintiff's right knee studies showed some slight decrease in joint height. (Tr. 368). Dr. Nemani placed Plaintiff on a number of medications to control her pain and eventually referred her to a pain psychologist. (Tr. 369, 371). An April 10, 2006 exam revealed tenderness and pain with range of motion in the

lumbar spine. (Tr. 373). Dr. Nemani assessed Plaintiff with "other symptoms referable to back" and "myalgia and myositis, unspecified." (Tr. 374). I find that there is substantial evidence in the record to support a conclusion that Plaintiff's musculoskeletal impairments were severe within the meaning of the Act. _____

**Chron's Disease**

Dr. Keith W. Kulja treated Plaintiff's Chron's disease since April 2002. (Tr. 298-332). His treatment notes reflected that Plaintiff suffered from Chron's disease since age 19. (Tr. 313). A December 5, 2002 colonoscopy showed changes of burned out Chron's colitis with pseudopolyps. (Tr. 319). A September 29, 2004 colonoscopy yielded the same results, but was not positive for Chron's disease. (Tr. 240). However, an April 7, 2005 pathology report showed abnormal gastric biopsies consistent with "moderate chronic effects." (Tr. 301). A January 25, 2007 colonoscopy was normal except for scattered pseudopolyps, with no evidence of active inflammatory bowel disease. (Tr. 400-1). Plaintiff's was treated with Sulfasalazine and Imuran.

The ALJ determined that Plaintiff's Chron's Disease was not severe under the Regulations. The ALJ, again, misstated that Plaintiff "testified that her last severe 'flare up' from Chron's disease was two years ago." Plaintiff, however, testified at the August 2007 hearing that she had a flare up about twice a year, and

that her last flare up had been "the last week of July." I find that the ALJ erred in ignoring Plaintiff's Chron's disease diagnosis.

**Sleep Apnea**

Sleep apnea is caused by periodic cessation of respiration associated with hypoxemia and frequent arousals from sleep. 20 C.F.R. Pt. 404, Subpt. P, App. 1. An April 25, 2005 CPAP titration study revealed that Plaintiff had severe obstructive sleep apnea and hypopneas. (Tr. 359). Plaintiff presented with severe snoring and hypoxemia. During one night's sleep at the Associated Sleep Center, Plaintiff had 194 apnea events, and 59 hypopneas events. (Tr. 358). Even with the assistance of a CPAP machine, Plaintiff continued to have apneas and hypopneas. (Tr. 359). Dr. Taj M. Jiva recommended that Plaintiff should use caution when driving an automobile or operating machinery due to an increased risk of accidents. (Id.). Additionally, Plaintiff was told to avoid alcohol and coffee before noon. (Id.). Dr. Jiva recommended a CPAP machine, and weight reduction. (Id.).

The ALJ noted that the Plaintiff was given a CPAP machine for her sleep apnea, but returned it because "she couldn't reach the prescribing MD on how to use it." (Tr. 29). Additionally, the ALJ noted that Plaintiff slept four hours a night and that her sleep apnea was "not as severe as alleged." (Id.). This determination directly conflicts with Dr. Jiva's findings. (Tr. 358-59). While

Plaintiff did achieve about four hours of sleep during the CPAP titration study, this does not undermine Dr. Jiva's diagnosis that Plaintiff' sleep apnea was severe. Additionally, Dr. Jiva reported that Plaintiff had excessive daytime sleepiness, loud snoring, and daytime fatigue.(Tr. 359). The Regulations indicate that daytime sleepiness that results from sleep apnea can affect memory, orientation, and personality, and preclude a patient from engaging in gainful work. 20 C.F.R. Pt. 404, Subpt. P, App. 1. "Neither the trial judge nor the ALJ is permitted to substitute his own expertise or view of the medical proof for the treating physician's opinion" or any competent medical opinion. Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000). See Burgess v. Astrue, 537 F.3d 117, 131 (2d Cir. 2008). "An impairment qualifies as non-severe only if, regardless of a claimant's age, education, or work experience, the impairment could not affect the claimant's ability to work." Salmi v. Sec. of Health and Human Servs., 774 F.2d 685, 687 (6th Cir. 1985). Here, the ALJ erred in not considering the effect Plaintiff's sleep apnea would have on her overall functioning and her ability to work.

**Obesity**

Social Security Ruling 02-1p requires the ALJ to consider the combined effect of obesity with a claimant's other impairments.

Plaintiff suffered from Level III extreme obesity,[5] which further exacerbated her condition. On April 28, 2005, Plaintiff weighed 255 pounds with a Body mass index of 46.6, and a body fat percentage of 56.1 percent. (Tr. 379). Dr. Alan Posner opined that "[i]t is my impression that the patient certainly has morbid obsesity with significant comorbidities of obesity including hypocholesterolemia, dyspnea on exertion, back pain, knee pain, depression, and gastroesophageal reflux disease." (Tr. 275). Dr. Thad J. Boss opined that her obesity was complicated by her Chron's disease and degenerative arthritis. (Tr. 519). Medical records from Dr. Posner and Dr. Boss indicate that Plaintiff failed to achieve weight loss through diet and exercise. (Tr. 275, 519). Plaintiff underwent insmed laproscopic band surgery on February 7, 2007. (Tr. 419). At the time of the hearing in August 2007, Plaintiff had lost over 60 pounds as a result of the surgery, and was 182 pounds. (Tr. 580).

The ALJ noted that Plaintiff denied symptoms from the lap-banding surgery, but did not further address Plaintiff's obesity, or its effect on the severity of her other impairments. (Tr. 29). As the Regulations indicate, obesity can cause disturbances to the musculoskeletal and respiratory systems, and "the combined effects of obesity with [these impairments] can be a major cause of disability in individuals with obesity." 20 C.F.R. Pt. 404, Supt.

---

[5] See SSR 02-1p. The National Institute of Health's "Clinical Guidelines" recognize three levels of obesity. Level I includes BMIs of 30.0-34.9. Level II includes BMIs of 35.0-39.9. Level III, termed "extreme" obesity and representing the greatest risk for developing obesity-related impairments, includes BMIs greater than or equal to 40." Id.
.

P, App. 1; See Barrett v. Barnhart, 355 F.3d 1065, 1068 (7ᵗʰ Cir. 2004) ("Even if [plantiff's] arthritis was not particularly serious in itself, it would interact with her obesity to make standing for two hours at a time more painful than it would be for a person who was either as obese as she or as arthritic as she but not both.") I find that the ALJ erred in ignoring the effect of Plaintiff's obesity on her overall functioning.

## V.  The ALJ improperly assessed the opinion of Plaintiff's treating physician, Dr. Bambrah

     Plaintiff argues that the ALJ failed to grant proper weight to the opinion of treating physician Dr. Sawaran C. Bambrah. The Regulations specify that "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) will be given 'controlling weight' if the opinion is 'well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in your case record.'" Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003)(quoting 20 C.F.R. 404.1527(d)(2); Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000); Rosa v. Callahan, 168 F.3d 72, 78-79 (2d Cir. 1999)).

On October 28, 2004, Dr. Bambrah completed an assessment for Plaintiff's health insurance company indicating that Plaintiff had cervical facet syndrome, symptomatic thoracic facet syndrome, degenerative disc disease and joint disease.  (Tr. 235). Dr. Bambrah prescribed Bextra for Plaintiff's symptoms. (Id.).  He

assessed that Plaintiff was able to work with others, supervise, work cooperatively in a group setting, and perform light work. (Tr. 236). However, Plaintiff could not sit or stand for "long periods."

In a questionnaire response to the New York State Office of Temporary and Disability Assistance Division of Disability Determinations, dated December 12, 2004, Dr. Bambrah stated that Plaintiff was "disabled from any gainful employment due to chronic back pain, shoulder-knee pain, anxiety, and morbid obesity." (Tr. 251). In a January 8, 2007 assessment for Plaintiff's insurance company, Dr. Bambrah stated that Plaintiff was "disabled indefinite," "unable to work any job," and "totally disabled from any gainful employment." (Tr. 432-35).

The ALJ granted no weight to Dr. Bambrah's opinion that Plaintiff was disabled because the determination of disability is an issue reserved to the Commissioner. (Tr. 31); see 20 C.F.R. §§ 404.1527(e)(1), § 416.927(e)(1).

"A treating physician's statement that the claimant is disabled cannot itself be determinative." Snell v. Apfel, 177 F.3d 128 (2d Cir. 1999). However, "[i]f the case record contains an opinion from a medical source on an issue reserved to the Commissioner, the adjudicator must evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record." SSR 96-5p. The factors that an ALJ must

consider when a treating physician's opinion is not given controlling weight include: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors." Schaal v. Apfel, 134 F.3d 496, 503 (2d Cir. 1998) (citing §§ 404.1527(d)(2) and 416.927(d)(2)).

A review of the entire medical record reveals that Plaintiff had been treated by Dr. Bambrah since 1999 for a number of medical conditions. Since 2004, Dr. Bambrah completed at least three attending physician statements which indicated that Plaintiff had the following conditions: cervical facet syndrome; symptomatic thoracic facet syndrome; degenerative disk disease and joint disease, which disabled her from employment. (Tr. 235). The record is replete with medical evidence that the ALJ overlooked the length of time Dr. Bambrah had been treating Plaintiff. In a letter dated December 11, 2006, Dr. Bambrah reports that he has treated Plaintiff for various conditions since 1999. (Tr. 425). Dr. Bambrah's office notes for visits between March 2003 through July 2007 indicate treatment for chronic pain, Chron's Disease, anxiety and obesity. Visits took place on an average of once every three months, although during some months the visits were more frequent and other months, less frequent. (Tr. 343-354, 527-533).

The record also reveals references to written reports, test results and summaries that were prepared by specialists to whom Plaintiff was referred by Dr. Bambrah. These documents reflect that Dr. Bambrah was copied in as primary treating physician and kept apprised of all visits and evaluations of specialists who treated Plaintiff. These records date back as far as April 2002. (Tr. 246-250 273, 292-296, 300, 305, 368-369, 372-375, 379-381, 426-430, 519-525).

Unfortunately, the ALJ focused upon only the disability insurance reports and forms filled out by Dr. Bambrah in October 2004, December 2004, January 2005, and January 2007, all indicating that due to chronic pain in her back, knees, and shoulders, she is unable to work. "Dr. Sawaran Bambrath's opinion of December 2, 2004 that the claimant is disabled . . . , is rejected because that opinion is reserved to the Commissioner, pursuant to SSR 96-5p." (Tr. 31).

That finding was erroneous and contrary to the weight of the medical evidence in the record that supports a finding of disability. The medical records are consistent with the treating physician's assessment of the nature and severity of Plaintiff's medical problems and the limitations caused by all of her impairments. Plaintiff's combination of fibromyalgia, back pain, musculoskeletal impairments, Chron's Disease, sleep apnea, and obesity combined to substantiate the limitations determined by the treating physician to impede Plaintiff's ability to work.

## VI.  The ALJ erred in dismissing evidence from Plaintiff's treating chiropractor

The ALJ further erred in affording "little weight" to the opinion of Neil Hedin, DC, because he is a chiropractor, and rejecting Dr. Hedin's residual functional capacity ("RFC") assessment dated June 26, 2007 because the entry notes differ from Neil Hedin's signature.  (See Tr. 31).  Essentially, the ALJ granted no weight to Dr. Hedin's opinion because chiropractors are not considered an acceptable medical source under the Regulations. See 20 C.F.R. § 404.1513.  "The ALJ has the discretion to determine the appropriate weight to accord the chiropractor's opinion based on all the evidence before him." Diaz v. Shalala, 59 F.3d 307, 313 n. 4 (2d Cir. 1995).

However, when evaluating evidence from medical sources that are not considered "acceptable" under the Regulations, the ALJ should consider: (i) how long the source has known and how frequently the source has seen the individual; (ii) how consistent the opinion is with other evidence; (iii) the degree to which the source presents relevant evidence to support an opinion; (iv) how well the source explains the opinion; (v) whether the source has a specialty or area of expertise related to the individual's impairment(s);  and (vi) any other factors that tend to support or refute the opinion.  See SSR 06-03p.

Here, Dr. Hedin saw the Plaintiff each month since 2001 (approximately six years).  His opinion was consistent with the

results of Plaintiff's x-rays and MRIs. While information from a chiropractor cannot establish the existence of a medically determinable impairment, it can be used to provide insight into the severity of Plaintiff's impairment and how it affects Plaintiff's ability to function. See SSR 06-03p. As a chiropractor, Dr. Hedin had special knowledge of Plaintiff's back, neck, and shoulder pain and ability to function. An ALJ must consider all of the available evidence in a claimant's case record, including opinions from both acceptable medical sources and other medical sources. See id..

The ALJ also rejected Dr. Hedin's RFC assessment, not only because he was a chiropractor, but because his "entry notes differ from Neil Hedin's signature." (Tr. 31). It is not the role of this court or the ALJ to engage in handwriting analysis. Given Dr. Hedin's extensive history (six years) of treating Plaintiff, the ALJ was not entitled to simply discount his opinion without considering the factors set forth in SSR 06-03p.

The ALJ clearly ignored relevant portions of the medical evidence in the record that would support a finding of disability. This selective adoption of only the least supportive portions of a medical source's statements is not permissible. See Dioguardi v. Commissioner of Social Security, 445 F.Supp.2d 288, 297 (W.D.N.Y. 2006). The ALJ "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96-8p.

Based upon the substantial medical evidence in the record, I conclude that Plaintiff's combination of fibromyalgia, back pain, musculoskeletal impairments, Chron's disease, sleep apnea, and obesity caused disabling pain and limitations which impeded Plaintiff's ability to work. Accordingly, I find that the totality of the objective medical evidence in the record supports a finding of disability.

## VII. The ALJ's finding that Plaintiff could engage in other substantial gainful activity is not corroborated by evidence in the record

Once a claimant has shown that she can no longer perform her past relevant work, the ALJ bears the burden of proving that the claimant can engage in other substantial gainful activity. 20 C.F.R. §§ 494.1520(g), 404.1560(c); see Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996); Carroll v. Secretary of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983). In the ordinary case, the ALJ satisfies this burden by considering the claimant's age, education, and work experience in conjunction with the applicable Medical-Vocational Guidelines ("Grid Rule"). See 20 C.F.R. Pt. 404, Subpt. P, App. 2.

In a case where both exertional and non-exertional limitations are present, however, the Grid Rules in Appendix 2 cannot provide the exclusive framework for making a disability determination. See 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200(e)(2); see Bapp v. Bowen, 802 F.2d 601, 605 (2d Cir. 1986).

Here, the ALJ determined that Plaintiff, who was 40 years old at the alleged onset date, was a younger individual with at least a high school education and the ability to communicate in English. (Tr. 31). The ALJ noted that Plaintiff had no transferrable skills but retained the ability to make a vocational adjustment to other unskilled jobs. Id. The ALJ determined that Rule 201.21 and 201.28 would direct a finding of "not disabled" if Plaintiff were able to perform the full range of sedentary work. (Tr. 31-2).

The ALJ relied upon Social Security Ruling 85-15 to support his finding that Plaintiff's additional limitations had "little or no effect on the occupational base of unskilled sedentary work." (Tr. 32). However, SSR 85-15 is intended to explain how the Grid Rules are applied when a claimant has solely non-exertional limitations. See SSR 85-15. "Nonexertional limitations can affect the abilities to reach; to seize, hold, grasp, or turn an object (handle); to [kneel]; to [stoop], or [crouch]. Fine movements of small objects, such as done in much sedentary work . . ., require use of fingers to pick, pinch, etc. . . ." Id. This Regulation does not apply to a case in which the claimant suffers from a combination of exertional and non-exertional impairments. See Roberts v. Shalala, 66 F.3d 179, 183 (9th Cir. 1995).

Here, Plaintiff has both exertional limitations, which limit her to sedentary work, and non-exertional limitations, which further erode her occupational base. She has limitations bending, climbing, stooping, squatting, kneeling, balancing, crawling, and

pushing/pulling with the upper extremities. (Tr. 29). Plaintiff can not climb ropes, ladders or scaffolds, work at areas of unprotected heights, or around heavy, moving, or dangerous machinery. Additionally, she can not work in areas where she would be exposed to temperature extremes. Plaintiff testified that she had difficulty with reaching, handling, and fingering, that she would often drop things, and that she experienced numbness in her arms. (Tr. 602). The ALJ relied on an inaccurate and incomplete RFC assessment, which characterized her non-exertional limitations as "occasional" and failed to include any of Plaintiff's limitations in manual dexterity or her need to alternate between sitting and standing. These limitations, however, have a significant impact on Plaintiff's ability to perform sedentary work:

> As a general rule, limitations of fine manual dexterity have greater adjudicative significance--in terms of relative numbers of jobs in which the function is required--as the person's exertional RFC decreases. Thus, loss of fine manual dexterity narrows the sedentary and light ranges of work much more than it does the medium, heavy, and very heavy ranges of work. The varying degrees of loss which can occur may require a decision-maker to have the assistance of a VS.

SSR 85-15. I find that the ALJ's reliance upon SSR 85-15 and Grid Rule 201.21 and 201.28 was inappropriate and constituted reversible error.

If a Grid Rule cannot be used, the testimony of a vocational expert or other similar evidence is required in order to support a finding of RFC. Rosa v. Callahan, 168 F.3d 72 (2d. Cir. 1999); see also, Jones v. Bowen, 841 F.2d 849, 851 (8th Cir. 1988). Here, the

ALJ simply concluded that Plaintiff's non-exertional limitations had "little or no effect on the occupational base of unskilled light work." (Tr. 25). If the ALJ chooses to proceed without vocational expert testimony, the ALJ "must provide a similar degree of specificity to achieve the underlying objectives of procedural fairness to the claimant and preservation of an adequate record for review." Decker v. Harris, 647 F.2d 291, 298 (2d Cir. 1981). Here, reliance on SSR 85-15 and the Grid Rules did not provide specific evidence that jobs were available in the national economy. In the absence of vocational expert testimony to the contrary, I find that the ALJ's determination that Plaintiff could perform unskilled work was erroneous.

In sum, evidence in the record supports the Plaintiff's claim that her combination of impairments caused physical limitations and severe pain that prevented her from working. Considering the opinions of Plaintiff's treating physician and other treating sources in conjunction with Plaintiff's testimony, I find that the Plaintiff is not capable of performing unskilled, sedentary work as the ALJ determined. The total record provides substantial medical evidence that Plaintiff is disabled within the meaning of the Act.

## CONCLUSION

For the reasons set forth above, this Court finds that the Commissioner's decision that the Plaintiff is not disabled was based on errors of law and was not supported by substantial evidence. The record contains substantial evidence of disability

such that further evidentiary proceedings would serve no purpose. I therefore grant judgment on the pleadings in favor of the Plaintiff and remand this case to the Social Security Administration for calculation and payment of benefits.

ALL OF THE ABOVE IS SO ORDERED.

S/Michael A. Telesca

_____
Michael A. Telesca
United States District Judge

DATED: Rochester, New York
       August 23, 2010